The SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, on Behalf of Terryl and Janella HERRON, Petitioners,

Brett and Audrey Cooper, Intervenors,

v.

Gordon G. BLACKWELL, Respondent,

Fleet Finance, Intervenor.

No. 90–8061.

United States Court of Appeals, Eleventh Circuit.

Aug. 9, 1990.

Harry L. Carey, Asst. Gen. Counsel, David H. Enzel, Chief Atty., Holly Cohen Cooper, Atty., U.S. Dept. of HUD, Washington, D.C.

Gordon L. Joyner, Joyner & Joyner, Atlanta, Ga., for Herron.

Thomas J. Hughes, Jr., Law offices of Robert G. Fierer, PC, Atlanta, Ga., for intervenors Brett and Audrey Cooper.

John E. Tomlinson, Richard B. Maner, Stone Mountain, Ga., for intervenor Fleet Finance.

Before HATCHETT, Circuit Judge, RONEY * and FAIRCHILD **, Senior Circuit Judges.

HATCHETT, Circuit Judge:

In this case of first impression under the Fair Housing Amendments Act of 1988, we are asked to enforce a decision and order of the United States Department of Housing and Urban Development. Concluding that the decision and order are supported by substantial evidence, we enforce.

## FACTS

Gordon G. Blackwell, a white male, is the sole owner of the property located at 4010 Indian Lakes Circle, Stone Mountain, Georgia (the house). Since 1970, Blackwell has

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

been a licensed real estate broker in Georgia. In August, 1988, the house became vacant. In April, 1989, Blackwell entered into a ninety-day exclusive listing of the house with real estate agent Don Wainwright.

In early May, 1989, Terryl and Janella Herron, an African–American couple, viewed the house accompanied by their agent, Kay Newbern. On May 10, 1989, the Herrons offered to buy the house for $80,000. Blackwell rejected the Herrons' offer.

Because the Herrons "really liked the house," on June 8, 1989, they offered to buy the house for $90,000. The following day, Wainwright brought the Herrons' offer to Blackwell. Blackwell also rejected this offer, but agreed to make a counteroffer of $92,000. According to Wainwright, at some point during their meeting, Blackwell asked whether the Herrons were black or white persons. Wainwright answered that he did not know because he was dealing directly with Newbern.

On June 10, 1989 Newbern presented Blackwell's counteroffer to the Herrons. Terryl Herron accepted the $92,000 purchase price by initialing and dating the counteroffer. Terryl Herron also made some changes to the terms, including a requirement that the "[s]eller [was] to pay total 5% towards closing & points."

A day later, Wainwright telephoned Blackwell and told him that the Herrons had accepted the $92,000 purchase price. According to Wainwright, he also described the changes that Terryl Herron had made to the counteroffer. Blackwell responded that they had an agreement, and instructed Wainwright to initial the changes on Blackwell's behalf and complete the acceptance block on the contract, indicating that all parties had agreed.

On June 13, 1989, the Herrons tendered their earnest money deposit and applied for a mortgage with Commonwealth Mortgage Company. At some time between June 13 and June 16, 1989, Blackwell telephoned Newbern and told her that the Herrons "got a great deal." According to Newbern, Blackwell also asked: "I know it's quite unusual for me to ask this question, I should not ask it, but are the purchasers black?" Newbern refused to answer the question, responding, "You're right, you're not supposed to ask that question."

On June 20, 1989, Wainwright brought a copy of the contract and a repair addendum to Blackwell's apartment. Blackwell reviewed the documents, initialed them, and dated the contract June 11, 1988 (the date on which he had agreed orally to the contract terms). Later that day, however, Blackwell left a message with Wainwright indicating that he wished to change the terms of the contract, to require the Herrons to pay the closing costs. Wainwright subsequently returned Blackwell's telephone call and informed him that they already had a completed contract. On June 22, 1989, Wainwright received a copy of the contract on which Blackwell had changed the terms to show that the buyer (the Herrons) would pay closing costs.

Thereafter, whenever Wainwright attempted to communicate with Blackwell about the matter, Blackwell would hang up the telephone. On July 9, 1989, Blackwell changed the locks on the front door of the house, and removed Wainwright's lock box. Three days later, Blackwell told Wainwright that he would not attend the scheduled closing with the Herrons.

On or before July 12, 1989, Blackwell posted "open for inspection" signs in front of the house. On July 16, 1989, Blackwell met with Brett and Audrey Cooper, who are white persons, and who were moving from Dallas, Texas, to Atlanta. On the same day, the Coopers signed a lease (starting July 25, 1989) with an option to purchase. Blackwell did not ask the Coopers about their rent or credit history, and did not ask them to complete an information sheet. Further, Blackwell did not inform the Coopers about his contract with the Herrons.

On July 18, 1989, Wainwright spoke with Brett Cooper, at the house, and told him that the house was under contract and that a closing had been scheduled. Brett Cooper then called Blackwell who said that

they (the Coopers and Blackwell) had a good contract.

The next day, Wainwright telephoned Blackwell to explain that the appraiser from the Herrons' mortgage company needed access to the house on July 20, 1989. Blackwell hung up the telephone, after telling Wainwright that he would not be at the closing. On July 20, 1989, Wainwright and the appraiser went to the house but it was locked and no one was present. Subsequently, in a telephone conversation, Blackwell told Newbern that she should never go into the house, and that he would not be going to a closing with the Herrons. Further, according to Newbern, Blackwell stated that he had leased/purchased the house to "some really good white tenants."

## PROCEDURAL HISTORY

On July 24, 1989, the Herrons filed a housing discrimination complaint with the United States Department of Housing and Urban Development (HUD), alleging that Blackwell had discriminated against them because of their race, in violation of the Fair Housing Act, as amended by the Fair Housing Amendments Act of 1988. 42 U.S.C.A. §§ 3601–19 (West 1977 & Supp. 1990). The Secretary of HUD (the Secretary) commenced an investigation of the complaint, and attempted to conciliate the matter.

In late July, 1989, HUD's general counsel authorized the Attorney General of the United States to seek prompt judicial action in federal district court to prevent Blackwell from selling or renting the property to anyone other than the Herrons. On August 2, 1989, the district court entered a preliminary injunction restraining Blackwell from, among other things, selling or leasing the property except to the Herrons, and requiring Blackwell to notify the Coopers (who, on the advise of counsel, intervened and attended the hearing) that they would have to vacate the property before the Herrons closed on their contract.

On August 15, 1989, Wainwright's office called Blackwell to inform him that the closing with the Herrons had been rescheduled for August 16, 1989. All of the necessary parties, with the exception of Blackwell, met for the closing. On August 17, 1989, the Coopers moved out of the house.

On August 30, 1989, the district court held Blackwell in civil contempt for, among other things, taking steps to sell or rent the property to someone other than the Herrons. The district court ordered Blackwell to pay a fine of $500 per day if he did not remove all "for sale" or "for rent" signs. Blackwell removed the signs the following day.

The Secretary issued a determination of reasonable cause and charge of discrimination against Blackwell on August 30, 1989, and filed it with the Office of Administrative Law Judges for HUD. After a three-day hearing, HUD's chief administrative law judge (ALJ) issued an initial decision and order in favor of the Secretary, the Herrons, and the Coopers. Among other things, the ALJ found that Blackwell had repudiated his contract to sell the house to the Herrons, and that his "purported reason ... was pretextual, and that the real reason was based on their race." The ALJ ordered Blackwell to sell the house to the Herrons at the contract terms and price, to obey several other injunctions, to pay compensatory damages to the Herrons and the Coopers, and to pay a civil penalty to the government. On January 22, 1990, the ALJ's order became final and enforceable.

On February 14, 1990, this court granted the Secretary's motion for a restraining order prohibiting Blackwell from taking any actions in violation of the ALJ's order pending this court's final resolution of the Secretary's application for enforcement. One week later, Blackwell petitioned the United States Bankruptcy Court for the Northern District of Georgia for bankruptcy.

This court subsequently (a) granted the Coopers' motion to intervene, (b) granted the Secretary's motion to join Fleet Finance, Inc. (Fleet) as a party, and to enjoin the scheduled foreclosure sale of Blackwell's house, and (c) denied the Secretary's motion to appoint a trustee. On April 18, 1990, we granted the Secretary's motion to

modify the ALJ's order to dissolve the injunction against the public sale of the house, and to dismiss Fleet from this lawsuit. The Secretary's motion was based on the Herron's decision not to purchase the house. Consequently, the legality of the ALJ's order, insofar as it requires the sale of the house to the Herrons, is now moot.

## CONTENTIONS

The Secretary urges enforcement of the decision and order because they are supported by substantial evidence on the record taken as a whole. Blackwell, acting without counsel, contends that the ALJ's finding of discrimination is erroneous because (1) Newbern and Wainwright lied when they testified before the ALJ, (2) no valid contract existed between himself and the Herrons and (3) in any event, the contract was voided.

## ISSUE

The sole issue in this case is whether the ALJ's decision and order are supported by substantial evidence on the record taken as a whole.

## DISCUSSION

### A. The Fair Housing Act's Prohibitions

As amended by the Fair Housing Amendments Act of 1988, the Fair Housing Act makes it unlawful to, among other things:

(a) to refuse to sell ... after the making of a bona fide offer, or to refuse to negotiate for the sale ... of, or otherwise make unavailable or deny, a dwelling to any person because of race....

....

(c) to make, print, or publish ... any ... statement ... with respect to the sale ... of a dwelling that indicates any preference, limitation, or discrimination based on race ... or an intention to make any such preference, limitation, or discrimination.

(d) to represent to any person because of race ... that any dwelling is not available for inspection [or] sale ... when such dwelling is in fact so available.

42 U.S.C.A. § 3604(a), (c) & (d) (West Supp. 1990). Further, the Fair Housing Act makes it unlawful:

to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of ... any right guaranteed or protected by section 3603, 3604, 3605 or 3606 of this title.

41 U.S.C.A. § 3617 (West Supp.1990).

### B. The Fair Housing Amendments Act's Administrative Enforcement Mechanism

Congress enacted the Fair Housing Act of 1968 to eliminate housing practices which discriminate on the basis of race, color, national origin, religion and sex. Inadequate enforcement provisions, however, frustrated achievement of the Fair Housing Act's objectives:

Twenty years after the passage of the Fair Housing Act, discrimination and segregation in housing continue to be pervasive. The Department of Housing and Urban Development estimates that 2 million instances of housing discrimination occur each year. In the most recent national study of housing discrimination, HUD concluded that a black person who visits 4 agents can expect to encounter at least one instance of discrimination 72 percent of the time for rentals and 48 percent of the time for sales.

....

Existing law has been ineffective because it lacks an effective enforcement mechanism. Private persons and fair housing organizations are burdened with primary enforcement responsibility. Although private enforcement has achieved some success, it is restricted by the limited financial resources of litigants and the bar, and by disincentives in the law itself. The federal enforcement role is severely limited.

Under existing law, although HUD investigates housing discrimination complaints, it can use only 'informal methods of conference, conciliation and persuasion' in an attempt to resolve them. HUD can do no more than this and lacks the power even to bring the parties to the conciliation table. HUD cannot sue

violators to enforce the law, as in other civil rights laws.

The Justice Department can sue, but can do so only in cases of a 'pattern or practice' of discrimination. In order to redress the ordinary individual case of discrimination, the victim of discrimination must bring a lawsuit in court. Although private enforcement has achieved success in a limited number of cases, its impact is restricted by the lack of private resources, and is hampered by a short statute of limitations, and disadvantageous limitations on punitive damages and attorney's fees.

H.R.Rep. No. 711, 100th Cong., 2d Sess 15–16, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2176–77 (footnotes omitted). In response to the perceived gap in enforcement, Congress enacted the Fair Housing Amendments Act of 1988 (1988 Act). The 1988 Act creates an elaborate administrative enforcement mechanism.

Following is a brief overview of key provisions of the 1988 Act's administrative enforcement scheme. Under the 1988 Act, an "aggrieved person" may, not later than one year after an alleged discriminatory housing practice has occurred or terminated, file a complaint with the Secretary. 42 U.S.C.A. § 3610(a)(1)(A)(i) (West Supp. 1990). An "aggrieved person" is defined as "any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S. C.A. § 3602(i) (West Supp.1990). After a complaint is filed, the Secretary must serve notice upon the parties advising them of their procedural rights and obligations. 42 U.S.C.A. § 3610(a)(1)(B) (West Supp.1990).

The Secretary is also required to complete an investigation of the alleged discriminatory housing practice within 100 days after the filing of the complaint, unless it is impracticable to do so. 42 U.S. C.A. § 3610(a)(1)(B)(iv) (West Supp.1990). During the period from the filing of the complaint and ending with the Secretary's filing of a charge or a dismissal, the Secretary is required to engage in conciliation between the parties. 42 U.S.C.A. § 3610(b)(1) (West Supp.1990). If the Secretary concludes, at any time following the filing of a complaint, that prompt judicial action is necessary to carry out the aims of the Fair Housing Act, the Secretary may authorize the Attorney General to commence a civil action for appropriate temporary or preliminary relief pending final disposition of the complaint. 42 U.S.C.A. § 3610(e) (West Supp.1990).

If the Secretary determines that reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the Secretary is required, with one exception, to immediately issue a charge on behalf of the "aggrieved person."[1] 42 U.S.C.A. § 3610(g)(2)(A) (West Supp.1990). When a charge is filed under the Fair Housing Act, as amended, a party may elect to have the claims asserted in the charge decided in a civil action as opposed to an administrative proceeding. 42 U.S. C.A. § 3612(a), (*o*) (West Supp.1990).

Unless an election is made to have the claims decided in a civil action, the Secretary is required to provide an opportunity for a hearing before an administrative law judge. 42 U.S.C.A. § 3612(b) (West Supp. 1990). Any aggrieved person may intervene as a party in the proceedings. 42 U.S.C.A. § 3612(c) (West Supp.1990). The 1988 Act also makes provision for discovery consistent with the needs of the parties. 42 U.S.C.A. § 3612(d) (West Supp. 1990). At the hearing, each party may appear in person, be represented by counsel, present evidence, cross-examine witnesses, and obtain the issuance of subpoenas. 42 U.S.C.A. § 3612(c) (West Supp. 1990).

After an administrative hearing, the ALJ is required to make findings of fact and conclusions of law. 42 U.S.C.A. § 3612(g)(2) (West Supp.1990). If the ALJ

---

1. Where, however, the challenged housing practice involves the legality of any state or local zoning or other land use law or ordinance, the Secretary is required to refer the matter to the Attorney General for appropriate action under 42 U.S.C. § 3614. 42 U.S.C.A. § 3610(g)(2)(C) (West Supp.1990).

finds that a violation of the Fair Housing Act has occurred or is about to occur, the ALJ is required to issue promptly an order for such relief as may be appropriate, including actual damages the aggrieved person suffered, as well as injunctive or other equitable relief. 42 U.S.C.A. § 3612(g)(3) (West Supp.1990). Further, in order to vindicate the public interest, the ALJ may assess a civil monetary penalty. 42 U.S. C.A. § 3612(g)(3) (West Supp.1990). Any party aggrieved by a final order for relief under the Fair Housing Act, may obtain judicial review of the order in the appropriate United States court of appeals. 42 U.S.C.A. § 3612(i)(1) (West Supp.1990). Further, the Secretary may petition the appropriate United States court of appeals for the enforcement of the ALJ's order and for appropriate temporary relief or restraining order. 42 U.S.C.A. § 3612(j)(1) (West Supp.1990); 24 C.F.R. 104.950 (1989). Any party to the proceeding before the ALJ may intervene in the court of appeals. 42 U.S.C.A. § 3612(k)(2) (West Supp.1990).

### C. Standard of Review

We will affirm the ALJ's findings of fact if they are supported by substantial evidence on the record as a whole.[2] *See, e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cities of Lakeland & Tallahassee v. Federal Energy Regulatory Commission*, 702 F.2d 1302, 1311 (11th Cir.1983) (quoting *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). "It is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Cities of Lakeland & Tallahassee*, 702 F.2d at 1311 (quoting *Consolo*, 383 U.S. at 620, 86 S.Ct. at 1026).

2. Congress specifically intended this standard to apply to review of the Secretary's findings in Fair Housing Act proceedings. H.R.Rep. No.

### D. Governing Legal Framework

█ In this case, the ALJ applied the legal framework developed by the federal courts in discrimination cases brought under the Fair Housing Act of 1968 and Title VII of the Civil Rights Act. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hill v. Seaboard Coast Line R.R.*, 885 F.2d 804, 808 (11th Cir.1989); *Selden Apts. v. U.S. Dept. of Housing & Urban Development*, 785 F.2d 152, 159 (6th Cir. 1986). We agree with the ALJ that the three-part burden of proof test developed in *McDonnell Douglas* governs in this case.

> Under that test:
> First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its action. Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext.

*Pollitt v. Bramel*, 669 F.Supp. 172, 175 (S.D.Ohio 1987) (Fair Housing Act claim) (quoting *McDonnell Douglas*, 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825) (citations omitted).

█ In this case, the Secretary establishes a prima facie case by proving: (1) that the Herrons are members of a racial minority; (2) that the Herrons applied for and were qualified to purchase Blackwell's house; (3) that Blackwell rejected the Herrons; and (4) that the house remained available thereafter. *See Selden Apts.*, 785 F.2d at 159.

### E. The ALJ's Decision

Applying this legal framework, the ALJ found that the Secretary established a pri-

711, 100th Cong., 2d Sess. 38, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2199.

ma facie case of racial discrimination. We hold that this determination is supported by substantial evidence on the record as a whole. First, the Herrons are African-American persons. Second, the Herrons offered to buy the house and were qualified to buy the property. Specifically, the ALJ found (a) that the Herrons tendered their earnest money deposit, (b) that they made a timely application for a mortgage and (c) that they obtained a mortgage commitment. Third, Blackwell rejected the Herrons' offer when he repudiated the contract. Fourth, by posting "for sale" or "for rent" signs and attempting to rent the house to the Coopers, Blackwell made the property available to others after he had repudiated his contract with the Herrons. Having established a prima facie case, the Secretary created a rebuttable presumption that Blackwell unlawfully discriminated against the Herrons. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

■ The burden then shifted to Blackwell to articulate a legitimate, nondiscriminatory reason for his actions. *See Burdine,* 450 U.S. at 253–56, 101 S.Ct. at 1093–95. Blackwell argues that he refused to sell the house to the Herrons because he had not realized that the contract required him to pay closing costs and discount points. The ALJ correctly ruled that Blackwell "articulated a nondiscriminatory reason for rejecting the Herrons which, if taken in the light most favorable to him, would be legitimate."

■ Blackwell's articulation of a nondiscriminatory reason for his actions rebutted the presumption created by the prima facie case and shifted to the Secretary the burden of proving, by a preponderance of the evidence, that the reasons were merely a pretext for discrimination. *See Burdine,* 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095. The ALJ found that the Secretary demonstrated that Blackwell's proffered "reason for rejecting the Herrons was pretextual and that the motivation for his actions was discriminatory animus."

We conclude that the ALJ's finding is supported by substantial evidence. First, Blackwell is an experienced real estate broker who has studied commercial law at the college level. It is unlikely, therefore, that he signed a contract without realizing that it required him to pay closing costs and points. Second, numerous inconsistencies and contradictions in Blackwell's testimony supported the ALJ's conclusion that Blackwell's proffered rationale for his actions was merely a pretext.

Third, the Secretary and the Herrons introduced evidence that race motivated Blackwell in this transaction. For example, Blackwell asked both real estate agents whether the Herrons were black persons. When questioned as to why he asked about the Herrons' race, Blackwell explained that "[i]t's just standard procedure, I like to know with whom I'm dealing ... [j]ust as I asked of Ms. Judge Evans [the federal district judge who ruled on the government's prompt judicial action request], is she black or white." Further, in his deposition, Blackwell described his reaction when he learned the Herrons were black: "I'm not objectionable to them but I'm going to raise the price. I raised the price two thousand dollars. I figured that wouldn't be enough to run them off. I was glad to have them."

Fourth, other evidence demonstrated that Blackwell is obsessed with race. For example, on July 9, 1987, he wrote a note to the last tenant who occupied the house at 4010 Indian Lake Circle, who was a white person, explaining that he would not evict him because "negros [sic] will be the next lessee [sic] ... I do not want to see this area go black for the sake of the other residents of the area." In addition, after entering the lease with the Coopers, respondent Blackwell described them to Newbern as "really good white tenants" and to a newspaper reporter as "very fine white people." Further, in an interview with an investigator for the Georgia Real Estate Commission regarding charges filed against him because of his dealings with the Herrons, Blackwell stated that "he belonged to a club ... he could take anybody

872

to lunch that he wanted to as long as you weren't a nigger."

Finally, Blackwell's conduct following his inquiries about the Herrons' race supports the ALJ's determination that discriminatory animus motivated Blackwell's actions. For instance, despite his contract with the Herrons, Blackwell actively looked for other buyers, leaving up signs indicating the house was open for inspection. Further, Blackwell's treatment of the Coopers, who are white persons, supports the conclusion that he was eager to do business with white people.

On appeal, Blackwell contends that the ALJ erred for three reasons: (1) Newbern lied when she testified that she never received a "corrected contract" Blackwell claims he mailed her on June 11, showing that the Herrons would have to pay the closing costs; (2) Wainwright lied when he testified that he gave Blackwell a copy of the final contract and that Blackwell authorized him to initial the contract on his behalf; and (3) no contract existed between the Herrons and Blackwell and that, in any event, Blackwell "voided" the contract.

We are not persuaded by Blackwell's appellate contentions. As the Secretary correctly points out, this is not a contract law case; it is a race discrimination case. The Fair Housing Act's prohibitions against, for instance, discriminatory refusals to sell or negotiate, apply regardless of whether a valid contract existed. 42 U.S.C.A. § 3604(a) (West Supp.1990). Additionally, the ALJ found the testimony of the government's witnesses, including Newbern and Wainwright, to be credible. The ALJ's credibility determinations are entitled to special deference, and the record is replete with evidence supporting the ALJ's finding that Blackwell lacks credibility. *See NLRB v. Castaways Management, Inc.*, 870 F.2d 1539, 1542 (11th Cir.1989). Finally, substantial evidence supports the ALJ's conclusion that the Herrons and Blackwell entered into a valid contract and, further, that the contract was not legally voided by Blackwell's subsequent actions.

The evidence before the ALJ supports the finding that discriminatory animus mo-

tivated Blackwell in his dealings with the Herrons. Further, the ALJ's ultimate conclusions are supported by substantial evidence: (1) by refusing to sell the house to the Herrons, Blackwell violated 42 U.S.C.A. § 3604(a) (West Supp.1990); (2) by asking Wainwright and Newbern the race of the Herrons as potential buyers, Blackwell violated 42 U.S.C.A. § 3604(c) (West Supp. 1990); (3) by Blackwell's statements that, among other things, he would not sell the house to the Herrons, by his actions attempting to lease or sell the house after contracting with the Herrons, and by his refusal to allow the Herrons' appraiser access to the house, Blackwell violated 42 U.S.C.A. § 3604(d) (West Supp.1990); and (4) by interfering with the Herrons' exercise and enjoyment of their rights under 42 U.S.C.A. § 3604, Blackwell violated 42 U.S.C.A. § 3617 (West Supp.1990).

**F. The ALJ's Remedies and Order**

*1. The Herrons*

When the ALJ finds that a person has engaged in a discriminatory housing practice, the ALJ is required to "issue an order for such relief as may be appropriate, which may include actual damages suffered by the aggrieved person," and "damages caused by humiliation and embarrassment." 42 U.S.C.A. § 3612(g)(3) (West Supp.1990); 24 C.F.R. § 104.910(b)(1). The ALJ awarded the Herrons $44,591.60, including damages for economic losses ($4,591.60) and embarrassment, humiliation and emotional distress ($40,000.00).

We find that the ALJ's award of damages to the Herrons is rational and fully supported by the record. Beyond the economic losses incurred by the Herrons including lost wages and profits, the ALJ found that the most significant damage suffered by the Herrons, as a result of Blackwell's actions, was "embarrassment, humiliation, and emotional distress." "[D]amages for emotional distress ... 'may be inferred from the circumstances as well as proved by the testimony.'" *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir.1983) (quoting *Gore v. Turner*, 563 F.2d 159, 164 (5th Cir.1977)). "That the

amount of damages is incapable of exact measurement does not bar recovery for the harm suffered." *Marable,* 704 F.2d at 1220.

In explaining the award of damages for "embarrassment, humiliation, and emotional distress," the ALJ relied upon the Herrons' testimony concerning their disappointment in being unable to move, and the humiliation caused by the knowledge that someone would deny them the right to buy a house because of their race. As Janella Herron testified, "I feel that everything that has been fought for over the last 30 years ... was a waste of lives, a waste of time on the part of all those people who worked so hard for equal justice.... Our lives have been put on hold because we are not allowed to live where we can afford and choose to live." Further, the Herrons testified about the invasion of privacy caused by the publicity, and their physical symptoms which included loss of sleep and headaches.

### 2. *The Coopers*

■ The ALJ held that the Coopers are "aggrieved persons" under the Fair Housing Act, as amended, and awarded them $20,594.21 in damages. This award includes damages to compensate the Coopers for economic losses ($594.21) and embarrassment, humiliation and emotional distress ($20,000). We agree with the ALJ that the Coopers come within the definition of "aggrieved persons." The 1988 Act broadly defines an "aggrieved person" to include any person who has "been injured by a discriminatory housing practice." 42 U.S.C.A. § 3602(i) (West Supp.1990). The Coopers, like the Herrons, have been injured by Blackwell's discriminatory acts.

First, the Coopers suffered economic loss because they were forced to repack and relocate. Second, the Coopers endured embarrassment, humiliation and emotional distress as a direct consequence of Blackwell's actions. The Coopers testified that they felt "emotionally torn" and in "the middle of a tug-of-war." Although they were guilty of no wrongdoing, having unwittingly leased the house from Blackwell,

they felt the need to defend themselves by hiring a lawyer. Because of the media attention the case received, the Coopers testified that they feared for the safety of their children and changed the locks on the house. Further, Audrey Cooper, who had recently started teaching at a racially mixed elementary school, testified that she felt she was "treated with suspicion." The forced move from the house not only placed a strain on "family unity," but it also deprived them of the home which they had hoped to purchase. We hold that the ALJ's award of damages to the Coopers is reasonable and supported by substantial evidence.

### 3. *Civil Penalty*

■ In addition to awarding compensatory damages to the Herrons and the Coopers, the ALJ imposed upon Blackwell the maximum civil penalty of $10,000. The 1988 Act provides that an ALJ may, "to vindicate the public interest, assess a civil penalty against the respondent—(A) in an amount not exceeding $10,000 if the respondent has not been adjudged to have committed any prior discriminatory housing practices." 42 U.S.C.A. § 3612(g)(3) (West Supp.1990).

The ALJ found the maximum civil penalty to be appropriate: (1) because of the egregious nature of Blackwell's actions; (2) because Blackwell "bears the full weight of responsibility for his actions and their effects on both the Herrons and the Coopers, since as a ... licensed real estate broker with nearly 20 years experience, he knew or should have known that his actions were not only wrongful, but also, were unlawful"; (3) because Blackwell introduced no evidence concerning his financial circumstances that would militate against the maximum civil penalty; and (4) because the "goal of deterrence, as well as the interests of justice, will be served by the ... maximum civil penalty." We hold that the ALJ's reasons for imposing the maximum civil penalty are rational, well supported by the record and consistent with the objectives of the Fair Housing Act.

#### 4. *Injunctive Relief*

The ALJ also enjoined Blackwell from discriminating against the Herrons, or anyone else, with respect to housing because of race, color, religion, sex, familial status, national origin, or handicap.[3] 42 U.S.C.A. § 3612(g)(3) (West Supp.1990). "Injunctive relief should be structured to achieve the twin goals of insuring that the Act is not violated in the future and removing any lingering effects of past discrimination." *Marable,* 704 F.2d at 1221. Blackwell's past conduct amply supports the ALJ's conclusion that, without specific injunctions, Blackwell will continue his discriminatory conduct. *See United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 228–30 (5th Cir.1971) (race discrimination case where court remanded for entry of injunction against discrimination because of race, color, religion or national origin); *United States v. Pelzer Realty Co.,* 537 F.2d 841 (5th Cir.1976) (court affirmed district court's entry of injunction against discrimination on the basis of race, color, religion, or national origin as remedy for discrimination against blacks).[4]

### CONCLUSION

In conclusion, we hold that the ALJ's decision and order are supported by substantial evidence. The Secretary is directed to submit to this court, within sixty days of the date of this opinion, a proposed judgment in conformity with this opinion. The proposed judgment shall be served upon Blackwell, and he shall file any objections to the proposed judgment not later than ten days after receiving service.

ENFORCED

---

3. Paragraphs 1–5 of the ALJ's order, which require Blackwell to sell the house to the Herrons, are, as previously discussed, moot.

4. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.