Stanley JANCIK, Petitioner,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Leadership Council for Metropolitan Open Communities and Marsha Allen, Respondents.

Nos. 93–3792, 94–1519.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1994.

Decided Jan. 6, 1995.

Henry T. Synek, Richard J. Synek (argued), Synek & Synek, Chicago, IL, for petitioner.

David K. Flynn, Asst. Atty. Gen., Miriam R. Eisenstein, Asst. Atty. Gen. (argued), Dept. of Justice, Civil Rights Div., Appellate Section, Roberta Achtenberg, Carole Wilson, Harry L. Carey, Eileen F. Ray, U.S. Dept. of Housing and Urban Development, Washington, DC, for Dept. of Housing & Urban Development.

Edward A. Voci, Leadership Council for Metropolitan Open Communities (argued), Chicago, IL, for Leadership Council for Metropolitan Open Communities, Marsha Allen.

Before ESCHBACH, RIPPLE and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

· Stanley Jancik petitions for review of a decision of the Department of Housing and Urban Development ("HUD"), which found that he discriminated in the rental of an apartment on the basis of both race and family status in violation of section 804(c) of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(c). He also petitions for review of an order awarding attorney fees to the Leadership Council for Metropolitan Open Communities. We affirm.

## I.

Stanley Jancik owns Building No. 44 in King Arthur's Court, a large housing complex in the Chicago suburb of Northlake. King Arthur's Court houses people of all ages, including children, and although all of the apartments in Jancik's building have only one bedroom, they are large enough to house more than one occupant under local codes. The claims in this case arise out of Jancik's conduct in the rental of an apartment in that building. On August 29, 1990, Jancik placed this ad in a local suburban newspaper:

> NORTHLAKE deluxe 1 BR apt, a/c, newer quiet bldg, pool, prkg, mature person preferred, credit checked. $395....

Suspecting that the request for a "mature person" might reflect a violation of the Act, the Leadership Council's Investigations Manager Glenn Brewer decided to "test" the property. In that process, "testers" bearing fictitious identities pose as potential renters in order to check for discriminatory practices. In this instance, Brewer chose to use volunteer testers Cindy Gunderson, who is white, and Marsha Allen, who is African American, for the task.

Gunderson spoke with Jancik by telephone on the evening of September 7, 1990. She subsequently related that after asking Gunderson her age and learning that she was 36, Jancik told her "that was good—he doesn't want any teenagers in there." (Int. Ex. 5 at 6.) Jancik also asked Gunderson her name and, upon hearing it, inquired "what kind of name" it was. (*Id.* at 7.) Learning that the name was Norwegian, Jancik asked whether "that's white Norwegian or black Norwegian" and repeated the question a second time after Gunderson failed to answer. (*Id.*) Gunderson asked Jancik whether he was in-

quiring as to her race and, after he responded affirmatively, told him that she was white. Gunderson then asked to view the apartment and the two arranged for her to do so the following morning.

Marsha Allen spoke with Jancik two hours later the same evening. Jancik asked Allen her occupation, income, age, marital status, race and whether she had any children or pets. Allen did not reveal her race, but in response to that question asked Jancik why he needed this information. He responded, in her words, "that he had to screen the applicants because the tenants in the building were middle-aged and he did not want anyone moving in who was loud, made a lot of noise and had children or pets." (Int. Ex. 4 at 6.) When Allen told Jancik that she did not have any children or pets he said "wonderful," and the two arranged for Allen to see the apartment the next morning. (*Id.* at 7.) Both testers arrived the next morning at approximately 10:00, and Jancik's rental manager separately informed each that the apartment had been rented earlier that morning.

Based on the reports filed by Gunderson and Allen, the Leadership Council filed an administrative complaint with HUD on May 22, 1991. The Council charged that Jancik had violated section 804(c) of the FHA, 42 U.S.C. § 3604(c), which makes it unlawful:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

The Leadership Council claimed that Jancik's print advertisement violated the section by indicating a preference based on family status and that his interviews with the testers violated the section by indicating a prefer-

ence based on both race and family status. After HUD's General Counsel issued a "Determination of Reasonable Cause and Charge of Discrimination,"[1] the matter was set for hearing before Administrative Law Judge ("ALJ") William C. Cregar, as provided by 42 U.S.C. § 3612(b). With the Council and Marsha Allen as intervenors,[2] the ALJ conducted a two-day hearing in early June of 1993 and issued a 21-page Initial Decision and Order on October 1, 1993, which found that Jancik had violated section 3604(c). The ALJ awarded damages to the Leadership Council ($21,386.14) and to Marsha Allen ($2,000), assessed a civil penalty of $10,000, and enjoined Jancik from engaging in further acts of discrimination, all as authorized by 42 U.S.C. § 3612(g)(3). The ALJ's decision became final on October 31, 1993. *See* 42 U.S.C. § 3612(h).[3] The Leadership Council subsequently filed a petition requesting $23,842.50 in attorney's fees. Although Jancik did not raise any factual objections to the fee petition, which was supported by affidavits, he did request a hearing on the fees issue. In a February 10, 1994 order, the ALJ denied that request and granted the fees petition for the full amount requested. Jancik now seeks review of both of the ALJ's orders, as provided by 42 U.S.C. § 3612(i).

## II.

We will reverse the Secretary's decision only if it is "not in accordance with law," "without observance of procedure required by law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (D) & (E); *see also Soules v. HUD*, 967 F.2d 817, 821–22 (2nd Cir.1992); *Secretary, HUD ex rel. Herron v. Blackwell*, 908 F.2d 864, 870 & n. 2 (11th Cir.1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420,

---

1. Although HUD's Regional Counsel had initially issued a "Determination of No Reasonable Cause," HUD's general counsel issued a contrary determination upon reconsideration.

2. Following a determination of "reasonable cause" HUD becomes the "Charging Party" and

the complainant must move to intervene in the ALJ proceedings.

3. The Eleventh Circuit has discussed the administrative procedure set forth in the FHA in some detail in *Secretary, HUD ex rel. Herron v. Blackwell*, 908 F.2d 864, 869–70 (11th Cir.1990).

1427, 28 L.Ed.2d 842 (1971)). "Although we review the entire record, we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the Secretary." *Id.* We accord considerable deference to the credibility determinations of the ALJ. *Carry Cos. v. NLRB*, 30 F.3d 922, 926 (7th Cir.1994); *Indosuez Carr Futures, Inc. v. CFTC*, 27 F.3d 1260, 1266 (7th Cir. 1994).

■ Section 3604(c) prohibits the making or publishing of any statement or advertisement that "indicates" any preference or limitation based on, among other factors, race or family status. Whether a given statement or advertisement "indicates" such a preference is therefore central to our analysis. Although we have not previously dealt with the "indicates" aspect of section 3604(c), the circuit courts that have done so have employed a relatively straightforward approach, which we also find appropriate. First, every circuit that has considered a claim under section 3604(c) has held that an objective "ordinary reader" standard should be applied in determining what is "indicated" by an ad. Thus, "the statute [is] violated if an ad for housing suggests to an ordinary reader that a particular [protected group] is preferred or dispreferred for the housing in question." *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir.), *cert. denied,* 502 U.S. 821, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991);[4] *see also United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972); *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.,* ["HOME" ], 943 F.2d 644, 646 (6th Cir. 1991). In applying the "ordinary reader" test, courts have not required that ads jump out at the reader with their offending message, but have found instead that the statute is violated by "any ad that would discourage an ordinary reader of a particular [protected group] from answering it." *Ragin*, 923 F.2d at 999–1000.

■ Significantly, no showing of a subjective intent to discriminate is therefore neces-

sary to establish a violation of the section. *HOME*, 943 F.2d at 646; *Ragin*, 923 F.2d at 1000. At the same time, however, evidence of such intent is not irrelevant. Evidence that the author or speaker intended his or her words to indicate a prohibited preference obviously bears on the question of whether the words in fact do so. *See, e.g., Soules*, 967 F.2d at 825; *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907 (2d Cir.1993). Thus, if such proof exists, it may provide an alternative means of establishing a violation of the section. *See, e.g., HOME*, 943 F.2d at 646; *Soules*, 967 F.2d at 824.

■ In view of these guidelines, the ALJ's finding that Jancik's advertisement and statements expressed a preference based on family status in violation of section 804(c) was certainly supported by substantial evidence. First, Jancik told Allen that he did not want any families with children and told Gunderson that he did not want any teenagers in the building. In our view, both of these statements quite clearly would suggest to an "ordinary" listener that Jancik had a preference or limitation based on family status. The advertisement indicating his preference for a "mature person" was similarly problematic. Not only do we view that term as suggesting an unlawful preference to an ordinary reader,[5] the term is noted in the implementing regulation as being among "those most often used in residential real estate advertising to convey either overt or tacit discriminatory preferences or limitations." 24 C.F.R. § 109.20(b)(7). Of course, as Jancik points out, use of the listed terms does not violate the Act per se, but it does "indicate a possible violation of the act and establish a need for further proceedings on the complaint, if it is apparent from the context of the usage that discrimination within the meaning of the act is likely to result." *Id.* Here, the context of the usage, which included explicit verification of Jancik's preference to each of two prospective tenants who responded to

4. *Ragin* further explained that "an ordinary reader is neither the most suspicious nor the most insensitive of our citizenry." 923 F.2d at 1002.

5. *Cf. Hunter*, 459 F.2d at 215 (to the ordinary reader, the term "white home" indicates a racial preference and therefore violates section 3640(c).)

the ad, makes clear that the usage was meant to convey an unlawful preference.[6]

And, although we have no doubt that the Act has been violated based solely on this objective analysis, the record was also replete with evidence of Jancik's subjective intent to discriminate against families with children. For example, Jancik admitted at the hearing that he had told prospective tenants with children that there was no school in the area, when there was in fact a high school located on adjacent property and an elementary school within one mile. (June 2, 1993 Tr. at 59, June 3, 1993 Tr. at 14, 175.) Jancik also told the HUD investigator that he had previously turned away a single parent with a ten-year-old child. (June 3, 1993 Tr. at 8.)

■ Although the question of whether Jancik violated section 3604(c) by asking Gunderson and Allen about their race is somewhat more difficult, the ALJ's determination in that regard is also supported by substantial evidence. Unlike his comments regarding family status, Jancik did not expressly indicate a preference based on race, but merely asked the testers about their race. In the only case that has commented on the issue, the Second Circuit has indicated by way of dicta in *Soules* that questions about race standing alone are sufficient to violate the section because "[t]here is simply no legitimate reason for considering an applicant's race." 967 F.2d at 824. We need not decide that question here, however, because the context of the questions makes clear they did indicate an intent to discriminate on the basis of race. First, each question came in the midst of conversations in which Jancik was expressing other impermissible preferences. Hearing an inquiry about race immediately after being asked about children and told that applicants with children were undesirable, would, in our view, suggest to an ordinary listener that the racial question was part of the same screening process. Indeed, when Allen asked Jancik the purpose of his question about her race, he admitted that he

was, in her words, "screening the applicants." (Int. Ex. 4 at 6.) Jancik's unlawful purpose was similarly revealed in his conversation with Gunderson by the pointedness of his inquiry. After asking the origins of the Gunderson name and learning that it was Norwegian, he twice inquired whether Gunderson was "white Norwegian or black Norwegian" and subsequently admitted, in answer to her question, that he was inquiring as to her race. It is unlikely that if the inquiry had been merely conversational, as Jancik has contended, he would have pursued it with such determination. In addition, the fact that Jancik had never rented to an African American tenant before the Leadership Counsel filed its complaint in this case further bolsters the ALJ's conclusion that Jancik's question reflected an intent to exclude tenants on the basis of race.

### III. Attorney's Fees

■ Jancik does not contest the amount of attorney's fees awarded, but argues only that the ALJ abused his discretion in denying Jancik's request for a hearing on the issue. Aside from arguing in general that the fees were excessive, however, Jancik raised no factual objections to the fees petition. The ALJ addressed each of Jancik's legal challenges to the fees petition in a thorough order disposing of the matter. Because no facts were in dispute, the ALJ's determination that an evidentiary hearing was "unnecessary" (*See* Feb. 10, 1994 Order at 4) was not an abuse of discretion.

### IV.

For the foregoing reasons, we find that each of the ALJ's orders is both in accordance with law and supported by substantial evidence. Jancik's petitions for review are therefore DENIED.

---

**6.** Jancik cites *Soules* for the proposition that questions about children may sometimes be asked for legitimate reasons, such as local zoning ordinances that limit the number of permitted occupants or conditions in the neighborhood that are dangerous to children. *See* 967 F.2d at 824. Not only is the record here completely devoid of evidence suggesting that Jancik's questions were asked for any such permissible reasons, it makes clear that his reasons were impermissible.