**Edward SNYDER and Janet Snyder, Plaintiffs,**

v.

**BARRY REALTY, INC., an Illinois corporation, and various unidentified employees known as "Tammy" and "Carol," Don Barry, Maurice J. O'Brien, Patrick W. O'Brien, and Paul H. O'Brien, Defendants.**

No. 96 C 1041.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 12, 1996.

John T. Gonnella, Edward A. Voci, Edward A. Voci Law Office, Chicago, IL, for Edward Snyder, Janet Snyder.

Lawrence E. Morrissey, Lawrence E. Morrissey, Ltd., Chicago, IL, Robert Gary Grossman, Chicago, IL, Gilbert Y. Liss, Chicago, IL, for Barry Realty, Inc., Tammy, Carol, Don Barry.

### OPINION AND ORDER

NORGLE, District Judge:

Before the court are Plaintiffs' Motion for Partial Summary Judgment, and Defendants' Motion for Summary Judgment. For the following reasons, both motions are denied.

#### I. Background

Edward Snyder ("Snyder") and Janet Snyder (collectively "the Snyders") are a married couple with five minor children. Snyder decided to relocate to Evanston, Illinois, because he was accepted to, and intended to enroll in, a graduate program at nearby Northwestern University. Around June 9, 1994, Snyder traveled from California to Evanston to obtain an apartment for his family. Upon his arrival in .Evanston, Snyder approached employees of Defendant, Barry Realty, Inc. ("Barry"), and requested to see an apartment. Soon thereafter, employees of Barry showed Snyder two apartments locat-

ed at 632 Hinman Avenue in Evanston. Defendants Don Barry and Michael Aufrecht own the land and building at that address. Snyder then completed an application for unit 1A ("the unit") of the building, a three-bedroom apartment. In his application, Snyder disclosed that he intended that his spouse and five minor children would live in the unit with him, for a total of seven people in the unit.

Around June 23, 1994, an employee of Barry informed Snyder that Barry was rejecting Snyder's rental application. The stated basis for the rejection was Barry's occupancy policy, which provided for a maximum occupancy of four people for a three-bedroom apartment. Barry arrived at this occupancy policy through their "bedrooms plus one" rental policy. Under this policy, a maximum of three people may occupy a two-bedroom apartment, a maximum of four people may occupy a three-bedroom apartment, and a maximum of five people may occupy a four-bedroom apartment.

The court notes that Barry's occupancy policy is more stringent than Evanston's statutory occupancy requirements. Evanston's occupancy ordinance, No. 68–0–90, states that every bedroom occupied by more than one person shall have at least fifty square feet of floor space for each occupant. The Snyders could have lived in the unit without violating Evanston's occupancy ordinance. However, Barry refused Plaintiffs' application because of its own, more stringent, policy. The Snyders now assert that Barry discriminated against them based on their familial status by rejecting their application based on that policy. Both parties have moved for summary judgment.

## II. *Discussion*

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court may review the entire record, drawing all reasonable inferences from the record in the light most favorable to the non-moving party. *Cornfield by Lewis v. School Dist. No. 230,* 991 F.2d 1316, 1320 (7th Cir.1993). The burden of establishing the lack of any genuine issue of material fact rests with the movant. *Jakubiec v. Cities Serv. Co.,* 844 F.2d 470, 473 (7th Cir.1988).

The Fair Housing Act ("FHA") makes it unlawful to "refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of ... familial status...." 42 U.S.C. § 3604(a). "Familial. Status" refers to the presence of minor children in the household. 42 U.S.C. § 3602(k). "It has long been recognized that to give full measure to the Congressional purpose behind the FHA, courts have given broad interpretation to the statute." *Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 731 (S.D.Ill.1989) (citations omitted).

■ The Department of Housing and Urban Development ("HUD") "has adopted a three-part test set forth in *McDonnell Douglas Corp. v. Green,* for evaluating claims of discrimination under the Fair Housing Act." *U.S. v. Badgett,* 976 F.2d 1176, 1178 (8th Cir.1992) (citation omitted). *See also Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1533 (7th Cir.1990) (noting that courts use employment discrimination analysis in FHA cases). First, plaintiffs must bear the initial burden of proving a prima facie case of housing discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ There are two theories of discrimination by which plaintiffs may proceed under the FHA: disparate treatment and disparate impact. Here, the Snyders' only viable option is disparate impact, as they do not state that Barry only applied its occupancy policy to families. *See Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1288 (7th Cir.1977) (noting that courts need not find an absence of discrimination simply because a policy impacts non-protected as well as protected groups). To establish a prima facie case of disparate impact under the FHA, plaintiffs "must show at least that the defendant's actions had a discriminatory effect." *Id.* at 1289–90; *Keith v. Volpe,* 858 F.2d 467, 482 (9th Cir.1988).

■ If plaintiffs succeed in establishing a prima facie case of discrimination, a presumption of illegality arises and the burden shifts to the defendants to articulate legitimate non-discriminatory reasons for the challenged policies. *Badgett,* 976 F.2d at 1178. If the defendants satisfy this burden, plaintiffs have the opportunity to prove by a preponderance that the non-discriminatory reasons asserted by the defendants are merely pretext for discrimination. *Id.*

## A. Prima Facie Case

The Seventh Circuit requires courts to consider four factors when evaluating whether FHA disparate impact plaintiffs have established their prima facie cases: 1) the strength of the discriminatory effect; 2) some evidence of discriminatory intent; 3) the defendants' interest in maintaining the allegedly discriminatory practice, and 4) the nature of the relief sought. *Id.* at 1290. Regarding the second factor of intent, the Seventh Circuit noted that, although plaintiffs must produce evidence of discriminatory intent, that evidence need only be "suggestive rather than conclusive." *Phillips v. Hunter Trails Comm. Assoc.,* 685 F.2d 184, 190 (7th Cir.1982). The language of *Arlington Heights* itself demonstrates that intent to discriminate need not be proven: the *Arlington Heights* court stated, "We now turn to determining under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate section 3604(a)." *Arlington Heights,* 558 F.2d at 1290.

■ The court reads the *Arlington Heights* standard in conjunction with more recent HUD interpretations of the FHA. "When, as in the FHA § 3614,[1] 'Congress explicitly delegates to an agency the authority to elucidate a specific statutory provision, the agency's interpretation is given controlling weight unless arbitrary, capricious, or manifestly contrary to the statute.'" *Mountain Side Mobile Estates v. Secretary of Housing & Urban Dev.,* 56 F.3d 1243, 1248 (10th Cir.1995) (quoting *New Mexico Dept. of*

*Human Servs. v. Dept. of Health & Human Servs. Health Care Fin. Admin.,* 4 F.3d 882, 884–85 (10th Cir.1993)). HUD's interpretation is significant to the court's analysis because HUD's "interpretation of the FHA 'ordinarily commands considerable deference', as 'HUD [is] the federal agency primarily assigned to implement and administer Title VIII.'" *Pfaff v. U.S. Dept. of Housing & Urban Dev.,* 88 F.3d 739, 747 (9th Cir.1996) (quoting *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979)). "[C]ourts must use their discretion in deciding whether, given the particular circumstances of each case, relief should be granted." *Id.* at 1289–90.

HUD has also commented on the relevance of the intent factor as it relates to the disparate impact theory. In administrative decisions, HUD has taken the position that facially neutral occupancy restrictions, such as Barry's "bedrooms-plus-one" policy, violate the FHA if they have a discriminatory effect, regardless of intent. *HUD v. Mountain Side Mobile Estates,* ("Mountain Side I") Fair Housing–Fair Lending, para. 25,053, at p. 25,492 (Nos. 08–92–0010–1 and 08–92–0011–1, Secretary of HUD, 7/13/93); *HUD v. Mountain Side Mobile Estates,* ("Mountain Side II") (Nos. 08–92–0010–1 and 08–92–0011–1, Secretary of HUD, 10/20/93) (slip op.).

■ Applying the four factors from *Arlington Heights* to the instant case, the court finds that the Snyders have established a prima facie case of discrimination by disparate impact. Regarding the first factor evidence of discriminatory effect, the Snyders demonstrate a strong showing of discriminatory effect by statistical data, and by illustrating how the policy effects families with more than one child. As to the third factor, the defendants' interest in maintaining the practice, the Snyders have also demonstrate that Barry's interest (in preventing large groups of Northwestern students from over-populating apartments) would not be served by rejecting the Snyders' rental application.

---

1. 42 U.S.C sec. 3614a provides: "The Secretary may make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this subchapter [FHA sec. 3604 et seq.]"

Moreover, considering the fourth factor, the nature of the requested relief. the Snyders do not request extreme affirmative remedies; e.g., they are not asking Barry to construct new housing for families.

The only remaining question goes to the second factor: whether the Snyders demonstrate some evidence of discriminatory intent. Barry's occupancy policy, although perhaps adopted without a deliberate intent to discriminate against families, in operation may be said to be the functional equivalent of intentional discrimination. *See Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988). Barry's policy forces couples with more than one child to rent housing with a separate bedroom for each child. Many (if not most) families cannot afford to provide separate bedrooms for each of their children. The Snyders could afford to rent the unit in controversy, except that Barry's rigid occupancy policy prevents them from doing so. The discriminatory effect of Barry's policy along with its inflexible application raise a question about whether Barry intends to exclude families. As such, this court is satisfied that under the *Arlington Heights* standard, the Snyders have demonstrated "some evidence that is suggestive" of discriminatory intent. Accordingly, the court finds that the Snyders have sufficiently established a prima facie case of familial status discrimination under a disparate impact theory.

### B. Legitimate Non–Discriminatory Reasons vs. Pretext

█ Thus, the burden now shifts to Barry to articulate some non-discriminatory reason for its policy. Barry asserts that its occupancy policy avoids the risk of having large groups of Northwestern students overpopulate units in an attempt to reduce their rental payments. However, Barry does not contend that the Snyders would present such a problem.

█ Barry has articulated a non-discriminatory reason for its practice. Accordingly, the burden now shifts back to the Snyders to demonstrate that Barry's reasoning is merely pretext for discrimination. In the housing context, the Seventh Circuit has not yet specifically articulated which standard should be used to determine whether defendants' non-discriminatory reasons are legitimate rather than pretextual, and other circuits are in disagreement on the issue.

The Tenth Circuit applies the *"Mountain Side"* standard. *See Mountain Side Mobile Estates v. Secretary of Housing & Urban Dev.,* 56 F.3d 1243, 1254 (10th Cir.1995). The *Mountain Side* court ruled that defendants must demonstrate simply that their discriminatory practices bear a manifest relationship to the housing in question in order to survive a pretext challenge. *Id.* An insubstantial justification in this regard will not suffice, as such a low standard would allow discrimination through the use of spurious, although seemingly neutral, practices. *Id.* Thus, the *Mountain Side* standard requires, "[O]nce plaintiffs establish a prima facie case of disparate impact, the burden shifts to the defendants to produce evidence of a 'genuine business need' for the challenged practice." *Id.* If the defendants meet the burden of producing evidence of such a need for the practice, plaintiffs may rebut the defendants' reasoning by showing that less restrictive practices could be implemented to serve the need. *Id.* As such, the *Mountain Side* standard essentially requires landlords to use the least restrictive practice to accomplish their non-discriminatory goals. If they do not do so, the *Mountain Side* standard deems the explanation pretextual.

The Seventh Circuit appears to follow the *Mountain Side* standard. In *Village of Bellwood v. Dwivedi,* 895 F.2d 1521 (7th Cir. 1990), the Seventh Circuit stated that, in *Arlington Heights,* it applied traditional employment law disparate impact analysis. Discussing that analysis, the *Bellwood* court commented:

> The Village had offered no strong reasons for refusing to rezone the tract in question. If, therefore, the refusal had a discriminatory impact, the failure to establish "business necessity" could, by analogy to Title VII disparate impact cases, condemn the refusal notwithstanding the absence of proof, direct or indirect, of racial animus.

*Id.* at 1532–33.[2] "Business necessity" analysis is *Mountain Side* analysis. *See Wards Cove*, 490 U.S. at 657–62, 109 S.Ct. at 2125–27 (noting that, once plaintiffs establish their prima facie disparate impact case, defendants must produce evidence of a business necessity for their practices, and the ultimate burden of persuasion that the defendants' reasoning is pretextual rests with the plaintiffs). Thus, the Seventh Circuit appears to follow the *Mountain Side* standard.

The court recognizes that the Courts of Appeals for the Ninth and Eighth Circuits have recently found the *Mountain Side* standard inappropriate. In *Pfaff v. Secretary of the Dept. of Housing & Urban Dev.*, the Ninth Circuit abandoned the *Mountain Side* standard in favor of a "reasonableness" standard for purposes of determining whether defendants' non-discriminatory reasons are legitimate. 88 F.3d 739, 747–48 (9th Cir. 1996). Rather than requiring defendants to use the least restrictive practices possible, the Ninth Circuit now requires that they use "reasonable" practices to achieve their non-discriminatory goals. In *United States v. Badgett*, 976 F.2d 1176, 1179 (8th Cir.1992), the Eighth Circuit held that the defendant's non-discriminatory explanation was in fact pretext. *Id.* In so holding, the *Badgett* court stated that "the occupancy restriction is not a *reasonable* means of dealing with the problem." *Id.* (emphasis added). Thus, "reasonableness" seems to be the appropriate standard in both the Eighth and Ninth Circuits.

The court recognizes that even application of the *Mountain Side* standard requires courts to consider the reasonableness of defendants' practices. *See Jancik v. Department of Housing & Urban Dev.*, 44 F.3d 553 (7th Cir.1995) (applying an "ordinary reader" standard to FHA provision prohibiting discriminatory advertising). Plaintiffs could certainly devise practices to accomplish defendants' non-discriminatory goals which are less restrictive but are also unrealistic (i.e., practices which force defendants to operate at financial losses). Also, the court is mindful that the United States Supreme Court has recently noted that the FHA "makes it plain that, pursuant to local prescriptions on maximum occupancy, landlords legitimately may refuse to stuff large families into small quarters." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, ——, 115 S.Ct. 1776, 1782, 131 L.Ed.2d 801 (1995).

Given these caveats, the court considers the instant case under the *Mountain Side* standard. In order for the court to grant summary judgment in the instant case, Barry must produce sufficient unrebutted evidence of its business necessity or the Snyders must unequivocally demonstrate that Barry's non-discriminatory reason is more restrictive than necessary. The court finds that neither party has carried its summary judgment burden.

Barry states that it seeks not to discriminate against families, but to avoid the risk of damage caused by large numbers of students living in its apartments. Barry does not attempt to explain any business necessity which forces it to apply its policy rigidly; that is, it does not explain why it applies the policy regardless of whether those seeking to inhabit Barry's apartments are students as opposed to families with children far too young to attend Northwestern University. The court notes that "[r]isk discrimination is not [familial] discrimination"; yet efforts to avoid particular risks "may produce classifications that could be generated by discrimination." *N.A.A.C.P. v. American Family Mut. Ins. Co.*, 978 F.2d 287, 290 (7th Cir. 1992). In the instant case, Barry's attempt to avoid overcrowding risks excludes many families from its apartments. It has not explained or sufficiently evidenced a business

---

**2.** The *Bellwood* court further noted, "Whether the analogy works, especially after the Supreme Court curtailed Title VII disparate impact liability in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *see also Allen v. Seidman*, 881 F.2d 375 (7th Cir. 1989), is not a question we need decide." *Wards Cove* holds that a statistical showing of a high percentage of minority workers in one segment of an employers' work force, as opposed to a low percentage in another segment, does not, without more, establish a prima facie case of racial discrimination in the second segment. *Wards Cove*, 490 U.S. at 657–58, 109 S.Ct. at 2125. As discussed above, the Snyders have shown more than mere statistical evidence in order to establish their prima facie case under *Arlington Heights*. As such, the court finds that *Wards Cove* and its progeny do not alter the outcome of the instant case.

necessity which forces it to do so. Thus, Barry has not met its burden, and the court may not grant its motion for summary judgment.

At the same time, the Snyders have not sufficiently demonstrated that Barry could use a less restrictive practice to achieve its stated non-discriminatory goal. To grant summary judgment, the court must be able to find that no reasonable juror would disagree with the Snyders' position. As such, the court may not grant the Snyders' motion for summary judgment.

### III. *Conclusion*

Applying the *Mountain Side* standard to the instant FHA familial discrimination disparate impact case, the court finds that the case must be resolved by a trier of fact. Based on the foregoing discussion, the court denies Barry's motion for summary judgment, and also denies Snyder's motion for partial summary judgment.

IT IS SO ORDERED.