**HOUSING RIGHTS CENTER, et al., Plaintiffs,**

v.

**DONALD STERLING CORP., et al., Defendants.**

**No. CV 03–859–AHM(EX).**

United States District Court, C.D. California.

Aug. 1, 2003.

---

**5.** The Court notes that the mere "passing along" of a letter is not a confidential communication.

Felicia Eldorrado Yearwood, Los Angeles, CA, Danielle Ranee Jones, Gary Wayne Rhoades, Los Angeles, CA, for Plaintiffs.

William H. Lancaster, Seyfarth Shaw, Jeffrey K. Riffer, Jeffer Mangels Butler & Marmaro, Los Angeles, CA, Brian T. Ashe, Seyfarth Shaw, San Francisco, CA, Michael T. Kennick, King & Kennick, Huntington Beach, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

MATZ, District Judge.

This is a housing discrimination case. Plaintiffs claim that Defendants have engaged in various discriminatory practices in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and California law. Plaintiffs now move for a preliminary injunction.

For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part, as follows:

(1) The Court DENIES Plaintiffs' motion to enjoin Defendants from conducting investigations or inspections while impersonating health or housing inspectors.

(2) The Court DENIES Plaintiffs' motion to enjoin Defendants from demanding information about any tenant's race, age or familial status but GRANTS Plaintiffs' motion to enjoin Defendants from demanding information about national origin in the provision of services or facilities generally made available to tenants.

(3) The Court DENIES Plaintiffs' motion to enjoin Defendants from purchasing any residential rental property in Los Angeles.

(4) The Court GRANTS Plaintiffs' motion to enjoin Defendants from using the word "Korean" in the names of Defendants' apartment buildings.

The foregoing summary does *not* contain the precise language to be used in the Court's injunction.

## BACKGROUND

### I. Plaintiffs

All of the Plaintiffs in this case sue on their own behalf and on behalf of the general public. First Amended Compl. ("FAC") ¶ 9.

#### A. *The Housing Rights Center*

The Housing Rights Center ("HRC") is a non-profit California corporation based in Los Angeles that actively supports and promotes "freedom of residence" for all persons without regard to race, color, religion, gender, national origin, familial status, disability, sexual orientation and source of income. Decl. of Marlene Garza (HRC's Chief Executive Officer) ¶ 5; FAC ¶ 5. HRC provides outreach and education services and investigates allegations of discrimination. FAC ¶ 5. *See generally* Garza Decl.

HRC has proffered evidence that it has incurred costs and has diverted resources to investigate possible discriminatory practices at Defendants' apartment buildings in response to a complaint received from Plaintiff Daryl Williams "and others." Garza Decl. ¶ 29. *See also* Defendants' Opp. Exh. 8 (letter from HRC to Defendant Donald T. Sterling explaining that HRC received complaints and subsequent-

ly conducted an investigation). HRC sent two "testers" to one of Defendants' apartment buildings and prepared "fair housing education packets" to send to over 225 tenants living in Defendants' buildings. *Id.* ¶ 36–37. Although HRC has not submitted an itemized list of costs incurred, the Garza Declaration is sufficient at this stage to establish HRC's standing as a Plaintiff in this litigation. *See Fair Housing of Marin v. Combs,* 285 F.3d 899, 902–905 (9th Cir.2002). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

### B. *Individual Plaintiffs*

The following individual Plaintiffs are current African–American or African–Jamaican residents of Defendants' apartment building at 691 S. Irolo St. in Los Angeles: Thomas Brown, Marie Davis, Karlene Henry, Dianne Wesley, and Daryl Williams. Brown Decl. ¶¶ 1–2; Davis Decl. ¶ 1; Henry Decl. ¶¶ 1–2; Wesley Decl. ¶ 1; Williams Decl. ¶ 1.

Plaintiff Jeffrey High also is African–American. He was a tenant at Defendants' 691 S. Irolo St. Property until September 2002. High Decl. ¶ 1.

Plaintiff Aubrey Franklin has not submitted a declaration in support of this motion, but Plaintiffs' complaint alleges that she is African–American and either was or is a tenant at Defendants' 691 S. Irolo St. property. FAC ¶ 6.

Plaintiff Dixie Martin was the manager or assistant manager of Defendants' 691 S. Irolo St. property until July 2002, and she lived on-site during that period. Martin Decl. ¶ 2; Martin Reply Decl. ¶ 10. Plaintiffs' complaint alleges that Dixie Martin is white. FAC ¶ 6.

Plaintiff Mary Young is a white tenant at Defendants' 691 S. Irolo St. property. Young Reply Decl. ¶¶ 1–2.

Plaintiffs' complaint alleges that Plaintiffs Soino Lugo and Ed Nell are Latino and are or were tenants at Defendants' 691 S. Irolo St. property. FAC ¶ 6. Soino Lugo is Plaintiff Daryl Williams's mother. Williams Decl. ¶ 2.

Plaintiffs' complaint alleges that Plaintiff Robin Steed is an African–American citizen of California and resident of Los Angeles. FAC ¶ 8.

Plaintiff Kandyce Jones passed away on July 21, 2003. Reply Brief at 1. Plaintiffs' complaint alleges that she was an African–American tenant at Defendants' 445 S. Ardmore St. property in Los Angeles. FAC ¶ 7.

### II. Defendants

Defendant Donald T. Sterling has been in the Los Angeles real estate business for 40 years. Sterling Decl. ¶ 1. He has purchased 99 apartment buildings in Southern California either personally or through various affiliated entities, including Defendants Donald T. Sterling Corp. ("DTSC"), Donald Sterling Family Trust, and Korean Land Company. Opp. at 2; D. Sterling Decl. ¶ 2. Sterling apparently conducts his apartment rental business using the name "Beverly Hills Properties." D. Sterling Decl. ¶ 2. Sterling's properties include apartment buildings at 691 S. Irolo St., 340 S. Ardmore Ave and 445 S. Ardmore Ave. D. Sterling Decl. ¶ 4.

Rochelle Sterling is married to Donald Sterling and is also a trustee of the Donald T. Sterling Family Trust. R. Sterling Decl. ¶ 1. Rochelle Sterling is not a named defendant in this action, although she is responsible for decorating and remodeling the hallways, lobbies and other common areas of Sterling buildings owned by the Family Trust. *Id.* ¶ 5.

### III. Plaintiffs' Factual Allegations

Plaintiffs' complaint and motion papers accuse Defendants of numerous discriminatory statements and housing practices, which the Court will summarize below.

Defendants vehemently deny most of Plaintiffs' allegations and fault Plaintiffs for being unreliable tenants and for being driven by hidden agendas.

A. *Discriminatory Statements, Advertisements or Inquiries*

1. *May 2002 Staff Meeting:* Plaintiffs claim that shortly after Donald Sterling purchased the 691 S. Irolo St. property he conducted a meeting of the building's staff during which he told Dixie Martin, among others, that he did not like Hispanic or African–American tenants, that he preferred Korean–American tenants, that he wanted his staff at the Irolo St. building to rent only to Korean–Americans, and that he planned to change the building's name. FAC ¶ 23. *See also* Martin Decl. ¶ 4.

2. *Additional Statements of Bias:* Sumner Davenport, a former property supervisor for Donald Sterling, declares that on separate occasions she heard Donald Sterling and Rochelle Sterling make disparaging comments about African–American and Hispanic tenants. First Davenport Decl. ¶ 16, 17. Plaintiff Martin states that she once spoke to David Kaufman, real estate agent for Donald Sterling, about a potential tenant and that Kaufman told her she could sign a lease with the applicant provided the applicant was Korean. Martin Decl. ¶¶ 8–9.

3. *Building Names:* Plaintiffs claim that Defendants have used the words "Korean" or "Asian" in the names of many of their rental properties. Specifically, Plaintiffs claim that Defendants changed the name of the 691 S. Irolo St. property from "Mark Wilshire Towers" to "Korean World Towers." FAC ¶ 24, ¶ 28. *See also* Plaintiffs' Exh. D (Notice of Rental Increase for "Korean World Towers" effective August 1, 2002); Martin Decl. ¶ 1 (stating that 691 Irolo St. building was previously known as "Mark Wilshire Towers"). Plaintiffs also claim that Defendants changed the name of the 445 S. Ardmore Ave. property to "Wilshire Korean Towers," re-named a building at 535 S. Alexandria in Los Angeles "The Sterling Korean Plaza," re-named a building at 344 Manhattan in Los Angeles the "Windsor Square Korean Towers," re-named a building at 500 S. Gramercy in Los Angeles the "Fremont Place Korean Plaza," and re-named a building at 442 S. Catalina in Los Angeles the "Hancock Park Asian Towers." FAC ¶ 28; Mem. of Points & Authorities at 7–8. *See also* Plaintiffs' Exh. P (photograph of sign in front of 445 S. Ardmore Ave property listing name of building as "Wilshire Korean Towers"); Plaintiffs' Exh. F (Los Angeles Times advertisement for apartment managers identifying 535 S. Alexandria property as the "Sterling Korean Plaza").

4. *Korean Flag Advertisements:* Plaintiffs claim that Defendants have featured the South Korean flag in advertising their rental properties. Plaintiffs point to an advertisement in the Los Angeles Times announcing that the American Korean Land Company (a subsidiary of DTSC) purchased several real estate properties. The ad features an American flag touching a South Korean flag. Plaintiffs' Exh. Y.

5. *Inquiries about National Origin:* Plaintiffs claim that in February 2003 Defendants sent all tenants at 691 S. Irolo St. a notice informing them that the building's garage would be closed beginning in March 2003 and that anyone who would like to receive a garage remote control would be required to complete a two-page application. FAC ¶ 44. The application, submitted as Plaintiffs' Exh. J, includes questions about place of birth and citizenship. FAC ¶ 44; Plaintiffs' Exh. J (Notice dated February 21, 2003).

B. *Discriminatory Treatment of Current Tenants*

Plaintiffs allege, and various declarants assert, that Defendants have failed to per-

form necessary repairs and maintenance requested by Latino and African–American tenants, have purposefully refused to accept rent from African–American and Latino tenants, have attempted to use those tenants' supposed failure to pay rent as a basis for eviction, and have subjected African–American and Latino tenants to various forms of degrading treatment, such as asking them to sign in as visitors at apartment buildings where they have long resided. *See* Davis Decl. ¶ 3 (refusal to provide maintenance services); Decl. of Mayra Oliva (refusal to accept rent); Henry Decl. ¶ 15 (being asked to sign in).

### C. *Sham Inspections.*

Plaintiffs claim that Rochelle Sterling has posed as a health inspector in an attempt to harass tenants. Plaintiff Daryl Williams declares that a woman knocked on his apartment door on April 3, 2003, complained to him about two carts in the hallway that contained some of Williams's possessions, and, when asked, stated that she was from the health department. Williams Decl. ¶¶ 10–16; Reply Williams Decl. ¶¶ 5–8. Williams video-taped part of this incident, and Sumner Davenport, a former Sterling property supervisor, identifies the woman on the video as Rochelle Sterling. Second Davenport Decl. ¶ 10. Davenport also declares that when she worked for Donald Sterling she sometimes accompanied Rochelle Sterling as the latter inspected tenants' apartments, that Rochelle Sterling would hold herself out as a government official, and that Rochelle Sterling required her to record tenants' ethnicity during inspections. *Id.* ¶¶ 3, 7–8.

### D. *Discriminatory Treatment of Prospective Tenants*

Plaintiffs make strong and troubling allegations that Defendants' management personnel lie to African–American and Latino applicants about the availability of rental apartments, *see* Oliva Decl, and that

management personnel showed an undisclosed Korean–American "tester" twice as many units as were shown to an African–American "tester." Decl. of Marlene Garza ¶ 37.

### E. *Employment–Related Allegations*

Plaintiffs claim that Defendants have discriminated against minority employees and against employees who object to Defendants' discriminatory housing practices. FAC ¶ 29. Plaintiffs also claim that Defendants have negligently failed to train their employees. *Id.* ¶ 74.

## IV. Plaintiffs' Legal Claims

Based on these allegations, Plaintiffs' complaint states claims under 42 U.S.C. § 1982 and under various sections of the federal Fair Housing Act. Plaintiffs also state common law claims for negligence and breach of the implied covenant of quiet enjoyment, as well as claims under California's Fair Employment and Housing Act, Unruh Civil Rights Act, Bane Civil Rights Act and unfair competition statute, Cal. Bus. & Prof.Code § 17200.

## MOTION STANDARDS

The traditional criteria for granting a preliminary injunction are "(1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the plaintiffs if injunctive relief is not granted; (3) a balance of hardships favoring the plaintiffs; and (4) advancement of the public interest." *Textile Unlimited., Inc. v. A.BMH & Co., Inc.,* 240 F.3d 781, 786 (9th Cir.2001). In this circuit, a party moving for a preliminary injunction may meet its burden by showing either: "(1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir.2001). "These

two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir.2000) (quoted in *A & M Records*, 239 F.3d at 1013).

## PLAINTIFFS' MOTION

Plaintiffs' preliminary injunction motion is based on Plaintiffs' Fair Housing Act Claims. *See* Mem. of Points & Authorities at 17–28. The Fair Housing Act ("FHA") explicitly provides for injunctive relief. 42 U.S.C. § 3613(c)(1).

Although Plaintiffs allege the many discriminatory acts described above, the preliminary injunction they propose relates to only a few of their claims. Plaintiffs seek to enjoin Defendants and their agents from (1) "Conducting investigations or inspections of plaintiffs and other tenants while impersonating health or housing inspectors;" (2) "Demanding any information regarding any plaintiff's or tenant's race, national origin, age or familial status;" (3) "Contracting to purchase any residential rental property in Los Angeles;" and (4) "Using the words 'Korean' or 'Asian' or Korean flag symbols in the names of any apartment building or advertising." Plaintiffs' [Proposed] Preliminary Injunction.

## ANALYSIS

### I. Purchases of Residential Rental Property

██ It would be plainly improper to enjoin Defendants from purchasing any residential rental property in Los Angeles, and the Court DENIES that unreasonable request. "Injunctive relief ... must be

tailored to remedy the specific harm alleged." *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Such an extraordinarily broad injunction cannot be said to be tailored to any specific harm Plaintiffs allege.

### II. Use of the Words "Korean" and "Asian" and of the South Korean flag

#### A. *Findings of Fact*

The Court finds evidence sufficient in the record to establish that Defendants used the word "Asian" in referring to a Sterling building in a published announcement, that Defendants used the South Korean flag in a second announcement, and that Defendants currently use the word "Korean" in the names of at least two apartment buildings.

██ It is not disputed that an advertisement announcing that Delson/Norris Investment Properties sold three buildings to DTSC appeared in the Los Angeles Times on November 10, 2002. Plaintiffs' Exh. R. One building is identified in the announcement as "Windsor Square Korean Towers." A second is identified as "Freemont [sic] Place Korean Plaza." The last building listed in the announcement is identified as "Hancock Park Asian Towers." Although the advertisement conceivably could have been placed by the buildings' seller, Plaintiff's Declarant Gary Rhoades states that he spoke to a representative of Delson/Norris Investment Properties on May 24, 2003. Rhoades Reply Dec. ¶ 5. That representative (apparently the same person pictured in the announcement) told Rhoades that Donald Sterling created and placed the ad without consulting Delson/Norris.[1] *Id.*

---

1. The Court may consider hearsay evidence in ruling on a motion for preliminary injunction. *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessi-

tates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the

It is also not disputed that the "American Korean Land Company," identified as a subsidiary of DTSC, published an advertisement in the Los Angeles Times on May 25, 2003. That ad announces the American Korean Land Company's purchase of six apartment buildings. The ad shows a South Korean flag touching an American flag. Plaintiffs' Exh. Y; Rhoades Reply Decl. ¶ 7 (authenticating document). Defendant Sterling does not deny that he is affiliated with the American Korean Land Company.

Donald Sterling states in his own declaration that he and his affiliated companies currently use the word "Korean" in the names of two apartment buildings—the "Wilshire Korean Ambassador" and the "Wilshire Korean Towers." D. Sterling Decl. ¶ 15. Sterling also acknowledges that he caused the building at 691 S. Irolo St. to be called "Korean World Towers," although the building's name has now been changed to "Ambassador Towers." D. Sterling Decl. ¶ 15. *See also* Plaintiffs' Exh. J (February 21, 2003 Notice to 691 S. Irolo St. tenants instructing them to make checks payable to "The Ambassador Towers").

### B. *Likelihood of Success*

#### 1. *The Statute*

The Fair Housing Act prohibits making, printing or publishing "any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). The governing regulations interpret this provision to cover "all written or oral notices or statements by a person engaged in the sale or rental of a

dwelling." 24 C.F.R. § 100.75. "Written notices and statements include any applications, flyers, brochures, deeds, signs, banners, posters, billboards or any documents used with respect to the sale or rental of a dwelling." *Id.*

█ The Fair Housing Act must be interpreted broadly to effectuate its purposes, *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1289 (7th Cir.1977), and the statute represents a "strong national commitment to promote integrated housing." *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 95, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). The importance of the statute's aims and the complexity of the problem it addresses cannot be ignored, even so many years after the Act's 1968 enactment. *Compare Mayers v. Ridley,* 465 F.2d 630, 632 (D.C.Cir.1972) (Wright, J., concurring) (explaining that years of housing discrimination and racial zoning "have yielded a bitter harvest of racially segregated schools, unequal employment opportunity, deplorable overcrowding in our center cities, and virtually intractable racial polarization") *with* Nancy A. Denton, *The Persistence of Segregation: Links between Residential Segregation and School Segregation,* 80 Minn. L.Rev. 795, 797 (1996) (documenting the persistence of residential segregation in the United States).

#### 2. *The "Ordinary Listener" Test*

█ Plaintiffs need not prove that Defendants acted with a subjective intent to discriminate in order to make out a claim for violation of § 3604(c). *Jancik v. Dep't of Housing & Urban Development,* 44 F.3d 553, 556 (7th Cir.1995). Instead, Plaintiffs must prove that Defendants' statements "would discourage an ordinary

purpose of preventing irreparable harm before trial.").

reader of a particular [protected group]" from applying for an apartment, *Jancik v. Dep't of Housing & Urban Development*, 44 F.3d 553, 556 (7th Cir.1995) (quoting *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir.1991)), or "would suggest to an 'ordinary [reader]' that people [of a particular race or national origin] are preferred or dis-preferred for the housing in question." *Llanos v. Estate of Anthony Coehlo*, 24 F.Supp.2d 1052, 1057 (E.D.Cal. 1998) (also quoting *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991)). The "ordinary reader" is "neither the most suspicious nor the most insensitive of our citizenry." *Ragin*, 923 F.2d at 1002.

3. *Plaintiffs have not demonstrated that their claim regarding use of the word "Asian" is likely to succeed.*

■ The only evidence Plaintiffs have thus far submitted of Defendants' use of the word "Asian" is a single announcement published in the Los Angeles Times and attached as Exhibit R to Plaintiffs' Memorandum. The Fair Housing Act prohibits any indication of a national origin preference in notices used "with respect to the sale or rental of a dwelling." 42 U.S.C. § 3604(c). The word "Asian" plainly refers to a racial group, but the announcement on which Plaintiffs rely merely states that Delson/Norris Investment Properties sold three buildings to DTSC. It does not advertise apartments for rent or sale and does not invite tenant or purchaser applications. Moreover, at the hearing on this motion, counsel for Plaintiffs acknowledged that the cited announcement appeared in the business section of the newspaper, not in the real estate or classified section.

Based on this record, the Court cannot conclude that Plaintiffs have shown likely success or raised serious questions going to the merits of their claim regarding use of the word "Asian," and, as a result, the Court will not enjoin Defendants' use of that word at this time. However, if Plaintiffs obtain evidence that Defendants have used or continue to use the word "Asian" in notices, announcements or advertisements "with respect to the sale or rental of a dwelling," Plaintiffs may renew their motion for such an injunction.

4. *Plaintiffs have not demonstrated that their claim regarding use of the South Korean flag is likely to succeed.*

■ Defendants' use of the South Korean flag in an announcement submitted by Plaintiffs as Exh. Y also does not give rise to a valid FHA claim. An ordinary reader would likely view the flag shown in Exh. J as a symbolic representation of the "American Korean Land Company" corporate name, not as a discriminatory message—particularly because the American flag also appears in the announcement. Use of the word "Korean" in a corporate name does not inherently violate the FHA, and this announcement, like the announcement using the word "Asian" discussed above, does not advertise apartments or seek tenants.

5. *Plaintiffs have demonstrated that their claims based on Defendants' use of the word "Korean" in apartment building names is likely to succeed.*

■ At issue in this case is the Fair Housing Act's prohibition against national origin discrimination. 42 U.S.C. § 3604(c). The very word used by Defendants—"Korean"—is necessarily and commonly understood to signify a particular national origin. *See Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) ("The term 'national origin' on its face refers to the country where a person was born, or, more broad-

ly, the country from which his or her ancestors came."). Given this ordinary understanding, use of the word "Korean" in the names of residential apartment buildings would indicate to the "ordinary reader" that the buildings' owner is not only receptive to but actually prefers tenants of Korean national origin. *Cf. United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.1972) (advertisement for apartment in a "white home" would naturally convey a racial preference to the ordinary reader); Henry Decl. ¶ 3 ("[W]hen Donald Sterling bought the [691 S. Irolo St.] property ..., the name was changed from the Mark Wilshire Towers to Korean World Towers. When the name changed like that I felt like they wanted a 'one race building.' "); Young Reply Decl. ¶ 3 ("For them to earmark the building with the word 'Korean' it was then very clear to me that the intention of the new owners was to cater to Korean tenants."); High Reply Decl. ¶ 8 ("I was living in the [691 S. Irolo St.] building when it was announced that the name of the building would be changed to Korean World Towers. This was a strong signal to me that everything would change in the building, that everything would be geared towards Korean tenants. The name itself told me this."). Perhaps if Defendants' apartments were built in a "Korean" architectural style, the natural and predictable inference might be different. But there is no indication that such is the case here. *See* Defendants' Opp. Exhs. 1–5 (photographs of some of Defendants' apartment buildings).

Defendants argue strenuously that their use of the word "Korean" in the names of these apartment buildings is acceptable because the buildings at issue are in the Los Angeles neighborhood known as "Koreatown."[2] But there is an undeniable

and important, although perhaps subtle, difference between "Koreatown" and "Korean." Because "Koreatown" denotes a neighborhood while "Korean" denotes a national origin, an ordinary reader would naturally conclude that the former word refers to a specific Los Angeles geographical area while the latter refers to a particular group of people. In this case, Defendants' use of the word "Korean" is particularly likely to suggest a national origin preference, not a geographic area, given that Defendants' buildings names include additional words that *do* signify location—*e.g.,* "*Wilshire* Korean Ambassador" and "*Wilshire* Korean Towers." An ordinary reader would logically assume that "Korean" must have a meaning *other* than geography, given that the locations of the buildings already are reflected by the word "Wilshire."

Los Angeles is, moreover, a remarkably polyglot city that, sadly, has been plagued by ethnic divisions for decades. Uneasy relations among different racial and immigrant groups still prevail in various sections of this city, and many residents would understandably regard the decision to place the word "Korean" in the name of a building in a racially diverse neighborhood as a coded message: "Koreans and Korean–Americans are welcome and preferred; others are not."

Of course, the Court recognizes that use of the word "Korean" is not necessarily a guise to achieve invidious discrimination. The word may commonly and appropriately be used on commercial buildings to designate a particular type of service or product—*e.g.,* a Korean restaurant, a Korean market or a Korean video store. But when used in the name of an apartment building the word "Korean" has no similar-

---

**2.** The Court makes no finding as to whether these buildings are actually located in or near "Koreatown."

ly obvious, nondiscriminatory meaning, and Defendants have failed to identify one.

### C. *Plaintiffs Have Demonstrated the Possibility of Irreparable Injury*

Because Plaintiffs have demonstrated likely success on the merits, they have established at least the possibility of irreparable injury. Irreparable injury is presumed from the fact of discrimination in violation of the Fair Housing Act. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir.2001). *See also Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.1984).

### D. *Balance of Hardships*

The balance of hardships also tips sharply in Plaintiffs' favor. The continued use of the word "Korean" in the names of buildings may discourage potential tenants, albeit in a way not easy to quantify or remedy. It is difficult to identify persons discouraged by a discriminatory message, and any effective educational or remedial campaign designed to counter the effects of the message necessarily will have to be broad-based and expensive.

Defendants, on the other hand, have not identified any hardship they are likely to suffer if ordered to remove the word "Korean" from their buildings' names. Donald Sterling first claims that his business "could" be affected by such a change and that any limitation on references to race or national origin in advertisements would prevent him from placing advertisements about the "phenomenal 'Asian' and/or 'Chinese' basketball player," Yao Ming.[3] D. Sterling Decl. ¶ 18. But this example of supposed injury is silly and farfetched. If Mr. Sterling placed an ad in the Los Angeles Times announcing "Clippers Have

---

**3.** Sterling identifies himself as owner of the Los Angeles Clippers N.B.A. franchise. D.

Signed Chinese Star Yao Ming to Five Year Contract" he would violate no law prohibiting discrimination. (Indeed, he would probably earn plaudits.)

Sterling also states vaguely that he will lose the "advertisement dollars" he has spent promoting his building names. *Id.* ¶ 18. How many of those dollars he has spent is not set forth, and Defendants' recent decision to change the name of their building at 691 S. Irolo St. from "Korean World Towers" to "Ambassador Towers" suggests that Defendants do not consider such changes to be prohibitively expensive. *Id.* ¶ 15.

Finally, Sterling theorizes that existing tenants "who have taken a fancy" to the "Korean" building names "could become upset and vacate their apartments." *Id.* ¶ 18. This concern appears speculative at best. No tenant has filed a declaration in support of Sterling's claim, and if Defendants are as effective at improving the quality and management of the buildings they acquire as they claim to be in their declarations, it is not likely that in Los Angeles, a city suffering from an acute shortage of housing rental units, tenants would be so easily induced to flee.

### E. *Conclusion*

For all these reasons, the Court will enter the following preliminary injunction:

> Defendants, their agents and employees, and those in active concert or participation with them, are (pending verdict after trial or resolution of this case) hereby preliminarily restrained and enjoined from using the word "Korean" in the name of any residential building they own or manage, including use in a

---

Sterling Decl. ¶ 1.

building name in any notice, advertisement, sign, application, flyer, brochure, deed, sign, banner, poster, billboard or document used with respect to the sale or rental of a unit or dwelling in such building. This injunction does not prohibit use of bilingual signs or notices, nor use of the word "Koreatown." [4]

## III. Questions about National Origin

Plaintiffs claim that Defendants have asked tenants to state their national origin as part of application for apartment services and that Defendants' questions violate 42 U.S.C. § 3604(c).

### A. *Findings of Fact*

The Court finds that in February 2003 Defendants sent tenants of 691 S. Irolo St. a notice that the building's garage would be closed and that tenants who wanted a garage remote control would be required to complete and submit a written "application." The application, submitted as Plaintiffs' Exh. J, asks tenants to identify the place where they and their spouse were born. *Id.* It also asks tenants to state their citizenship and date of naturalization.[5] *Id.* The notice and application emphasize that a "complete" response is necessary and that "[i]ncomplete information" will delay processing of the application. *Id.*

### B. *Likelihood of Success*

■ Plaintiffs have established likely success on the merits of their claim that asking a tenant to state his or her national origin as part of an application for apart-

ment-related services violates the Fair Housing Act, 42 U.S.C. § 3604(c).

As discussed above, the Fair Housing Act prohibits statements or notices that indicate a "preference, limitation or discrimination" based on national origin or that indicate an "intention to make any such preference, limitation or discrimination." 42 U.S.C. § 3604(c). The Court has found surprisingly little case law applying § 3604(c) to claims based on a landlord's questions, as opposed to declaratory statements. The Court also has found little case law applying § 3604(c) to statements made in connection with the provision of apartment-related services to current tenants, as opposed to statements made in connection with the sale or rental of an apartment to a new tenant. But this unexpected dearth of case law does not undermine the force of Plaintiffs' claim—and what little case law there is supports Plaintiffs' position.

In *Soules v. Dept. of Housing and Urban Development*, 967 F.2d 817, 824 (2d Cir.1992), the Second Circuit, by concurring in HUD's contention that "[t]here is simply no legitimate reason for considering an applicant's race," suggested in dicta that questions about race would violate the Fair Housing Act. In *Jancik*, the Seventh Circuit held that asking a prospective tenant to state her race violated § 3604(c). 4 F.3d at 557. Although the Seventh Circuit noted that the questions in that case were accompanied by an indication of other impermissible preferences, the court mentioned that factor in support its conclusion that the owner's questions were part of a

---

4. If Plaintiffs offer evidence that Defendants use "Koreatown" to identify buildings that are not actually in or near the "Koreatown" neighborhood, and if Plaintiffs believe such use violates § 3604(c), Plaintiffs will be free to raise that issue at a later date.

5. The garage remote control application does not ask tenants to state their race or familial status, and the Court will not enjoin such questions absent some evidence that they actually have been asked. Defendants' application does ask for date of birth, but age is not among the FHA's prohibited list of considerations.

"screening process." *Id.* In this case, Defendants' questions about place of birth actually appear on an "application" for basic services (restoration of previously-available garage access). This context, although slightly different from that in *Jancik*, also supports a conclusion that Defendants' place of birth question is part of a "screening process."

Defendants argue that Plaintiffs' claim fails because § 3604(c) only prohibits discriminatory statements made "with respect to . . . sale or rental." The "place born" question at issue here does not fall within this prohibition, Defendants contend, because it is directed to existing tenants, not prospective tenants, and because it relates to a particular service, not to sale or rental.

The Court rejects Defendants' tortured interpretation of the statute. There is no rational relationship between national origin and ability to safely operate a remote garage door opener, and the Fair Housing Act explicitly prohibits discrimination on the basis of national origin in the "provision of services or facilities" offered in connection with a home or apartment. 42 U.S.C. § 3604(b). Certainly a discriminatory statement made with respect to such services or facilities violates § 3604(c), even if not made at the moment of first sale or rental. Defendants' proposed distinction is inconsistent with an appropriately broad reading of the statute and makes little sense given that tenants denied garage access to which they previously were entitled are effectively denied the full benefit of the bargain entered into at the moment of first sale or rental.

Defendants also argue that their questions about national origin should be allowed because shortly after the terrorist attacks of September 11, 2001, an agent with the Federal Bureau of Investigation told Defendant Sterling's controller that Sterling should make every possible effort to learn whether any tenants in his buildings are foreign nationals. Schield Decl. ¶ 3. Defendant Sterling declares that the controller's conversation with an FBI agent was "one important factor" Defendants "took into consideration" in preparing the garage door opener application form. D. Sterling Decl. ¶ 16. No harm is done, Sterling adds, because if a tenant refuses to answer the national origin question, Defendants will still provide a garage door opener with "no actual ramifications." *Id.*

The Court rejects as sham Defendants' purported justification. The S. Irolo St. building is the focus of many of the allegations of discrimination summarized at the beginning of this Order. Nowhere do Defendants assert, despite their claimed security concerns, that they have prepared or circulated a comparable questionnaire in any of their other 98 apartment buildings, so it is fair to conclude that the application was uniquely directed to the S. Irolo St. tenants. Moreover, Mr. Sterling does not identify what other "factor[s]" Defendants took into account when deciding to ask these tenants at 691 S. Irolo St. to state their national origin, and Defendants do not explain why they suddenly took this action in February 2003, despite having acquired the building in April 2002, or why the FBI agent's suggestion about citizenship status led them to ask questions about place of birth. Finally, Mr. Sterling's assurance that a tenant's refusal to answer the "place born" question will have "no actual ramifications" is flatly inconsistent with the application form itself, which states that providing "incomplete information" will delay the application process.

## C. *Irreparable Harm and Balance of Hardships*

As with Plaintiffs' claim concerning use of the word "Korean," discussed *supra*,

Plaintiffs have demonstrated at least the possibility of irreparable harm, and the balance of hardships tips sharply in their favor. Defendants do not identify *any* hardship that will result from an order prohibiting questions about tenants' place of birth on applications such as that used at the S. Irolo St. building.

### D. *Conclusion*

 Because Plaintiffs have demonstrated a likelihood of success and the possibility of irreparable injury, and because the balance of hardships tips sharply in their favor, Plaintiffs are entitled to the following tailored relief:

> Defendants, their agents and employees, and those in active concert or participation with them, are (pending verdict after trial or resolution of this case) hereby preliminarily restrained and enjoined from asking or requiring tenants to state their national origin or place of birth on any application, form or questionnaire used in connection with the provision of building facilities, services or amenities, and they are restrained and enjoined from conditioning the provision of such facilities, services or amenities on national origin.

## IV. Inspections Conducted While Posing as a Health Inspector

Plaintiffs contend that Rochelle Sterling, acting as an agent of Defendants, poses as an official government health inspector in order to gain access to tenants' apartments and to harass and intimidate African–American and Latino tenants. Plaintiffs argue that Rochelle Sterling's actions violate the Fair Housing Act.

### A. *Findings of Fact*

The Court has reviewed the video tape made by Plaintiff Daryl Williams, which Williams claims shows Rochelle Sterling posing as a health inspector. The Williams tape, together with Sumner Dav-

enport's identification of Rochelle Sterling, Second Davenport Decl. ¶¶ 9–10, is evidence sufficient to support a finding that Rochelle Sterling did tell Plaintiff Williams she was a health inspector. Sterling's failure to deny that she made that statement reinforces this conclusion.

### B. *The Statute*

Section 3617 of the Fair Housing Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the Act. The Fair Housing Act's "interference" provision "has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *United States v. Hayward*, 36 F.3d 832, 835 (9th Cir.1994).

### C. *Plaintiffs' Claim*

The gravamen of Plaintiffs' claim is that Defendants' apartment inspections, during which Rochelle Sterling and others pose as health or inspectors, interfere with their quiet enjoyment of their apartments. Most of the Plaintiffs already have exercised their right to fair housing by renting apartments in Sterling buildings, *see Ohana v. 180 Prospect Place Realty Co.*, 996 F.Supp. 238, 243 (E.D.N.Y.1998), and those Plaintiffs may succeed with their § 3617 claim if they are able to prove that their race or national origin motivated Defendants' decision to inspect their apartments. *See Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir.2001) (*McDonnell Douglas* burden-shifting scheme inapplicable to interference claim under the Family and Medial Leave Act because plaintiff was only re-

quired to establish that her decision to take leave was a "negative factor" in adverse employment action in order to prove interference claim); *Brown v. City of Tucson*, 336 F.3d 1181, 1191–92 (9th Cir.2003) (distinguishing between retaliation and interference claims for purposes of deciding whether *McDonnell Douglas* burden-shifting scheme applies).

D. *Plaintiffs' Have Not Established Likely Success and Have Not Raised Serious Questions Going to the Merits of Their § 3617 Claim.*

■ Although Plaintiffs' evidence supports a finding that Rochelle Sterling falsely identified herself as a health inspector to Plaintiff Williams on April 3, 2003, there is no evidence in the record that Sterling ever entered Williams's apartment or that she asked about anything other than two carts plainly visible in the hallway. Williams and Plaintiff Henry declare that a woman claiming to be a city inspector examined their apartments in May 2002, Williams Decl. ¶¶ 6–8, Henry Decl. ¶¶ 7–8, and according to Henry, that woman was accompanied by the 691 S. Irolo St. building manager. Henry Decl. ¶ 7. But neither Williams nor Henry claims that the woman claiming to be an inspector was Rochelle Sterling, and there is no evidence in the record to support a finding that the woman who examined their apartments in May 2002 was not actually a government inspector of some kind.

Sumner Davenport declares that when she worked for Sterling she often accompanied Rochelle Sterling on apartment inspections, that Rochelle Sterling would regularly pose as a government official in order to gain access to tenants' apartments, and that during the inspections Sterling directed her to record, among other things, tenants' ethnicity. Second Davenport Decl. ¶¶ 3–8. But Davenport's allegations, standing alone, do not establish likely success. There is no evidence in the

record that tenants of a particular race or national origin have been targeted for inspection. Nor is there evidence that Defendants have used any "ethnicity" information gathered during such inspections—information Donald and Rochelle Sterling likely could have obtained independently simply by asking their building managers—for impermissible purposes.

Although the Court finds Sumner Davenport's allegations troubling, they neither establish likely success nor raise questions going to the merits that are sufficient to support an injunction. Impersonating a health inspector may itself be unlawful in other respects, but Plaintiffs are not entitled to the injunction they propose on their FHA interference claim.

## CONCLUSION

Plaintiffs' motion is GRANTED in part and DENIED in part. Plaintiffs shall submit a proposed Order consistent with this ruling. The Order shall include a provision conditioning the entry and effectiveness of the preliminary injunction on Plaintiff HRC posting a $1,000 bond.

IT IS SO ORDERED.